UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DUARTE & WITTING, INC dba NADER
CHRYSLER PLYMOUTH, and NADER EGHTESAD
and AFSANEH EGHTESAD, individuals,

        Plaintiffs,

  v.

UNIVERSAL UNDERWRITERS INSURANCE
COMPANY, and DOES 1 - 100, inclusive,

        Defendants.

No. C-05-1315 MHP

**MEMORANDUM AND ORDER**
**Re: Plaintiffs' Motion for Continuance; Defendant's Motion for Summary Judgment**

       On January 11, 2005 plaintiffs Duarte & Witting, Inc. dba Nader Chrysler Plymouth ("Nader Chrysler"), Nader Eghtesad and Afsaneh Eghtesad brought this action in California Superior Court, seeking declaratory relief and damages for an alleged breach of contract by Universal Underwriters Insurance Co. ("defendant" or "Universal"). On March 31, 2005 defendant removed the action to federal court. Now before the court is defendant's motion for summary judgment. Having considered the parties' arguments fully, and for the reasons set forth below, the court rules as follows.

BACKGROUND[1]

I.    Insurance Policy

       Universal insured plaintiffs under a multi-party policy for automobile dealerships (the "policy"), the term of which was from June 1, 2003 to June 1, 2004. Redfern Dec. ¶ 4, Exh. B. Pursuant to Part 330 of the policy, entitled Property Coverage, Universal is required to "pay for

LOSS[2] to the property scheduled at the LOCATIONS from any cause, except as excluded or as stated otherwise in the declarations." Id. at 22.  Among the listed Property Coverage exclusions are:

    (e)    wear or tear, shrinkage . . . gradual deterioration, rust, corrosion, change of weight, leakage of contents, inherent vice, latent or hidden defect, mechanical breakdown or derangement.  This exclusion does not apply to ensuing LOSS not otherwise excluded. . . ,

    (i)    *. . . settling, cracking, shrinkage, building or expansion of foundations, walls, floors, roofs or ceilings*.  This exclusion does not apply to any ensuing LOSS:
        (1)    caused by SPECIFIED PERILS,[3] except to ensuing LOSS from smog, smoke, vapor or gas from agricultural or industrial operations . . .

    (j)    faulty, inadequate or defective:
        (1)    planning, zoning, development, surveying, sitting;
        (2)    design, specifications, construction, grading, compaction;
        (3)    materials used in construction;
        (4)    workmanship or materials involved in repairs, alterations, remodeling, renovation or installation

    (k)    *acts or decisions*, including the failure to decide, or any person, group, organization, or governmental body.  This exclusion does not apply to ensuing LOSS not otherwise excluded;

    (l)    earth movement, including but not limited to earthquake, volcanic eruption, explosion or effusion, landslide, mudflow or mudslide, earth sinking, rising, or shifting . . .;

    (o)    flood, surface water . . . overflow of streams or other bodies or water, or their spray, all whether or not driven by wind; underground water that exerts pressure on, flows, seeps or leaks through foundations, walls, basement and other floors, or through doors, windows, or any opening in any of them.

    (s)    collapse, except when caused by SPECIFIED PERILS, UNNAMED PERILS[4] or BREAKDOWN[5] to the covered property.

Redfern Dec.¶ 4, Exh. B at 24–26 (emphasis added).

II.     <u>The Building</u>

Plaintiffs Nader Eghtesad and Afsaneh Eghtesad purchased a car dealership (Nader Chrysler) and an unreinforced masonry building (the "Ferry Building") from Galen Fitzhugh in 1998.  Nader Eghtesad (hereinafter "Eghtesad") Dep. at 18:21–20:2.  Both buildings are situated in Martinez, California and the Ferry Building is located at 908 Ferry Street.  The Ferry Building is a single story industrial building that is constructed of red brick masonry with unreinforced exterior walls. The Ferry Building is divided into two areas, Area A (a warehouse type area) and Area B (a small office space).  See Eghtesad Dep., Exh. I.  It is the Ferry Building which was insured by Universal between June 1, 2003 and June 1, 2004.  According to Eghtesad, at the time of purchase

he was not aware of any cracks in the walls of the Ferry Building, nor was he aware that the Alhambra Creek flowed below Area B of the building. Eghtesad Dep. at 251:5–11.

On May 15, 2003 Eghtesad rented the Ferry Building to Nestor Lopez for use as an auto body and repair shop. Prior to taking possession of the Ferry Building, on May 10, 2003, Lopez made a videotape chronicling the condition of the building—noting for example, the existence of loose fitting windows, abandoned car engine parts, a broken toilet, leakages and exposed wiring. Lopez made this videotape because Eghtesad had promised that he would make repairs to the property and he, Lopez, wanted to document the causes of his complaints. Lopez Dep. at 35:23–38:6. Among the problems highlighted in this videotape is a long crack in one of the walls through which sunlight appears to be visible. Lopez Dep. at 115:20–119:12, Exh. F. Plaintiffs do not genuinely dispute the authenticity of the videotape, but rather emphasize the fact that only "one" crack is featured. Lopez testified that at the time of his rental there were several cracks stretching all the way from the roof to the ground. Lopez Dep. at 25:3–16. According to Lopez, the cracks were over an inch wide, daylight was visible through some of them and there appeared to be some sort of patching to fill in the cracks. Lopez Dep. at 26:14–27:1. On May 10, 2003, Lopez asserts that he gave the videotape to Donita Donahue, manager of the Nader Chrysler, to forward to Nader Eghtesad. Lopez Dep. at 119:8–120:3. However Eghtesad contends that he never spoke with Lopez about the cracks. Eghtesad Dep. at 48:14–16.

According to Lopez, on or about May 20, 2003, Eghtesad sent a contractor to inspect the building for the purpose of repairing it. Lopez Dep. at 41:21–43:2. After the building had still not been repaired, Lopez placed a sign on the display glass of the premises expressing frustration with Nader Eghtesad for not keeping his promises to fix the property. That same month, May 2003, a number of Martinez city officials and inspectors noticed the sign and entered the premises. Lopez showed these officials the condition of the building. According to Lopez, they advised him to file a complaint if the building was not repaired. Lopez Dep. at 43:16–44:25. Between May and November, Lopez contacted the Martinez Building Department several times to report the state of the Ferry Building. City officials visited the building on approximately four to six occasions.

3

1    In June of 2003 Lopez requested that his lawyer send Nader Eghtesad a letter to remind him
2 that Lopez was still waiting for the repairs to be made to the Ferry Building before he would pay the
3 rent that was currently due. Lopez Dep. at 48:3–14, Exh. B. This letter included a list of the repairs
4 that Lopez wanted performed. "Cracks in the wall" was not included in the list. Lopez Dep. at
5 49:2–50:14. Lopez concedes that he was not particularly concerned about the cracks in the wall.
6 Lopez Dep. at 50:12–13. Ultimately, because Eghtesad failed to repair the doors, windows,
7 bathroom, and floor in the office area, Lopez removed his possessions from the premises and
8 videotaped the premises once again on December 17, 2003. Lopez Dep. at 33:22–35:24, 39:8–20.
9    Prior to his departure, Lopez did ultimately send a written complaint to the Martinez city
10 department and as a result, officials visited the Ferry Building on December 12, 2003. Lopez Dep.
11 at 46:17–47:4. Among the officials who visited during this and prior inspections were Don Salts and
12 David Scola. Scola observed that the cracks in the masonry wall "didn't look fresh." Scola Dep. at
13 27:11. Salts observed that there were a number of cracks with "mortar patch" in them. Salts Dep. at
14 30:1–32:23. Following this inspection visit, on January 9, 2004, the City of Martinez red-tagged the
15 Ferry building and issued a Notice and Order to Vacate ("Vacate Notice"), finding *inter alia* that
16 "the exterior walls on the south and west sides of the building have substantial cracks in them which
17 materially affect the structural strength and stability of the building," rendering the building
18 uninhabitable. Eghtesad Dep., Exh. D. at 31. According to the Vacate Notice, the costs of repair or
19 demolition would be borne by the property owner. Redfern Dec. ¶ 3.
20    Subsequently, on January 12, 2004, Nader Chrysler reported a claim to Universal. Redfern
21 Dec., Exh. A. The claim was assigned to adjuster James Redfern. Redfern Dec.¶ 2. Following this,
22 Universal retained a construction consultant—Associated Construction Services, Inc ("Associated
23 Construction")—to inspect the Ferry Building. See Redfern Dec., Exh. C (January 21, 2004 report
24 by Associated Construction). Universal also retained Rob Edwards of McLarens Young
25 International, an independent claim consulting firm to assist with their investigation of the claim. Id.
26 ¶ 6. Lastly, Universal retained James Wraith, an attorney with Selvin, Wraith & Halman LLP to
27 provide Universal with coverage advice. Id. ¶ 11.
28

4

On January 26, 2004, Redfern met with Nader Eghtesad and inspected the Ferry Building. During this inspection, Eghtesad showed Redfern a large crack in the wall through which Redfern could see daylight. "The crack appeared to have been patched with cement on at least one prior occasion." Redfern Dec.¶ 7. According to Redfern, Eghtesad believed that the cracks had been caused by a combination of a tenant (Lopez) using a "frame machine" to straighten car frames, and a clogged drain on the roof. Id. Nader Eghtesad contends that on a visit to the premises, he saw chains attached to the walls. Eghtesad Dep. at 28:11–12, 29:2–30:7. Lopez asserts that he never performed any repairs on cars inside the building and never hung anything from the walls. Lopez Dep. at 36:8–37:9. However, one of the city inspectors (Scola) stated that during his visit, he observed that "the tenant was doing auto repair work. There was[sic] auto parts in there and dismantled vehicles in there." Scola Dep. at 11:21–24.

Subsequently to this visit by the adjuster, Universal asked Eghtesad to submit any information or documents that he would like considered by Universal in its coverage determination. Redfern Dec. ¶ 16, Ech. 3; Wraith Dec. ¶ 8. Eghtesad produced two engineering reports by A.J. Miller & Associates and Capex Engineering. Redfern Dec. ¶ 17, Ech. 3; Wraith Dec. ¶ 8. According to A.J. Miller & Associates, the damage was

> due to settlement of the foundations . . . augmented by lack of drainage around the perimeter and possible past flooding. Some on[sic] the movement of the North extension may be due to the presence of the Alhambra Creek below. These problems have been exacerbated by past seismic activity.

Eghtesad Dep., Exh. U at 2. Capex Engineering had similar findings, noting that the damage was

> caused by (a) insufficient foundation and drainage systems design at old age, (b) Alhambra Creek flowing underneath and through building foundation without sufficient geotechnical consideration for foundation design caused foundation settlement, (c) too much raining[sic] water on the roof at raining season without enough downspouts.

Eghtesad Dep., Exh. V. In addition, however, Capex Engineering also found that the "tenant using chain anchors on the URM [unreinforced masonry] wall and concrete floor cause[d] concentrate[d] pressure on the URM Wall." Id.

Universal retained three engineering firms to investigate the cause of the damage to the Ferry Building. Initially, Universal retained Philip Henry of Madsen, Kneppers & Associates and

5

1  Murphy, Burr and Curry, Inc. However, after a site inspection on April 23, 2004, the engineers
2  determined that an investigation of the foundation of the building and soil conditions was warranted.
3  Thus, Universal also retained the geotechnical consulting firm of Ninyo & Moore.
4  According to Philip Henry,

> the damage observed consisting of movement and cracking of the masonry walls has been occurring over a period of many years. This is evident due to the reopening of the past patching attempts of the cracks.

Henry Dec. ¶7, Exh. C. Ninyo & Moore determined that differential soil settlement beneath the Ferry Building had been occurring for many years and that winter flooding from the Alhambra Creek had contributed to this differential settlement. Berg. Dec. ¶ 10, Exh. B. Murphy, Burr and Curry Inc. submitted its report in May/June of 2004. In it, they disputed conclusions made by Capex Engineering that the damage to the Ferry Building was due to (1) the use of "chain anchors" by a tenant, and (2) "too much raining[sic] water on the roof at raining reason and without enough downspouts." Murphy Dec. ¶¶ 8–11. According to the engineering firm, the damage was due to significant differential settlement which dated back, in all likelihood, to the building's initial construction.

Wraith, Universal's coverage attorney, reviewed and considered all the engineering reports submitted in relation to the Ferry Street Building and, finding those submitted by Universal more persuasive, concluded that the loss was not covered by Universal's policy for a number of reasons. First, he concluded that the damage to the Ferry Building occurred well before the beginning of the policy period. Second, Wraith concluded that the loss fell within exclusions (e), (i), (j), (k), (l), (o), (s) and (t) listed in the Property Coverage section of the policy. These opinions were set forth in a coverage opinion on December 7, 2004 and forwarded to the attention of Redfern. Wraith Dec. ¶ 11, Exh. A. Redfern relied on this advice and approved the denial of plaintiffs' claim. On December 14, 2005 a letter denying claim coverage was sent to Eghtesad. Wraith Dec. ¶ 12, Exh. B. Plaintiffs filed suit in this case following the denial.

On December 9, 2004, the Eghtesads also filed suit against the sellers of the property (<u>Nader Eghtesad v. Barbara Fitzhugh et al.</u>, Contra Costa Superior Court, No. C-04-01301) alleging their failure to disclose that the building "suffered from soil and groundwater conditions which [made] the

6

earth unstable and detrimental to the building." Def.'s Exh. 19 (Fitzhugh Complaint) at 5:19–28. According to a Mediation Statement filed by the Eghtesads in support of their complaint against the sellers of the Ferry Building, "there were multiple hairline cracks . . . in the unreinforced masonry." Eghtesad Dep. at 232:5–7. This suit was ultimately settled and the Eghtesads received $40,000 in settlement. See Eghtesad Dep. at 229:20–232:18, 234:19–235:1, 240:3–241:5, AA, BB; Mendelsohn Dep. at 22:5–16, Exh. G.

In essence, the parties are in dispute over the following: (1) the cause of the cracking of the walls of the Ferry Building; (2) the magnitude of the cracking prior to June 1, 2003; (3) whether or not Lopez used "chains" on the walls of the building, exacerbating the cracks already present; and (4) whether or not Nader Eghtesad received notice of the extent of the cracking.

LEGAL STANDARD

Summary judgment is proper when the pleadings, discovery and affidavits show that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those which may affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. Id. The party moving for summary judgment bears the burden of identifying those portions of the pleadings, discovery, and affidavits that demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Cattrett, 477 U.S. 317, 323 (1986). On an issue for which the opposing party will have the burden of proof at trial, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." Id.

Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). Mere allegations or denials do not defeat a moving party's allegations. Id.; Gasaway v. Northwestern Mut. Life Ins. Co., 26 F.3d 957, 960 (9th Cir.

1994). The court may not make credibility determinations, and inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the motion. Masson v. New Yorker Magazine, 501 U.S. 496, 520 (1991); Anderson, 477 U.S. at 249.

The moving party may "move with or without supporting affidavits for a summary judgment in the party's favor upon all or any part thereof." Fed. R. Civ. P. 56(a). "Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed. R. Civ. P. 56(e).

DISCUSSION

I. Motion for Continuance

Federal Rule of Civil Procedure 56(f) states in relevant part that:

> [s]hould it appear from the affidavits of a party opposing the motion that the party *cannot for reasons stated* present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or *may order a continuance* to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

Fed. R. Civ. Pro.56(f) (emphasis added). The Ninth Circuit has held that pursuant to Rule 56(f), a party seeking continuance must "conclusively justify his entitlement to the shelter of Rule 56(f) by presenting specific facts explaining the inability to make a substantive response as required by Rule 56(e)." Securities and Exchg. Comm'n v. Spence & Green, 612 F.2d 896, 901 (9th Cir. 1980). Further "sufficient facts" showing that the evidence sought exists and would prevent summary judgment" is required. Nidds v. Schindler Elev. Corp., 113 F.3d 912, 920–21 (9th Cir. 1991). Thus the "mere hope" of discovering further evidence is "an insufficient basis for continuance." Continental Martitime of San Francisco v. Pacific Coast Metal Trades Dist. Council, 817 F.2d 1391, 1395 (9th Cir. 1987).

Plaintiffs move for a continuance of the summary judgment motion, contending that this will enable them to conduct three additional, and allegedly crucial, depositions—viz. the depositions of Rick and Vicky Frame (former tenants of the Ferry Building) and Robert Edwards (an employee of Universal). In support of this continuance motion, plaintiffs assert that the testimony of Rick and

8

1  Vicky Frame "*could prove helpful* to either party in this case" and "*will likely* controvert the
2  evidence of Dependant's engineers" with respect to the magnitude of the cracks prior to the policy
3  term since the Frames were tenants before June 1, 2003. See Pl.'s Motion for Continuance ¶ 5
4  (emphasis added). Additionally, plaintiffs assert that Edwards deposition is "crucial" in determining
5  Universal's "delay" for purposes of a punitive damage claim. Plaintiffs contend that they were
6  unable to depose Edwards prior to discovery cut-off date of June 3, 2006 because of difficulties with
7  the calendar of plaintiffs' counsel. Plaintiffs provide no explanation for their failure to depose Rick
8  and Vicky Frame.

9        This attempt by plaintiffs to avoid summary judgment is unpersuasive. Not only have they
10 failed to proffer specific facts that would defeat summary judgment, but as discussed *infra* any
11 evidence of an absence of recognizable "cracks" in 2002 is not dispositive as plaintiffs themselves
12 have conceded that cracks existed prior to the start of the policy period. Further, as noted *infra*,
13 plaintiffs are not entitled to punitive damages. Plaintiffs have failed to conclusively establish an
14 entitlement to continuance and their motion is hereby denied.

16 II.     Breach of Contract
17      A.     Manifestation Rule

18       Defendant contends that its decision to deny plaintiffs' claim is not a breach of contract
19 because the loss in question predated the inception of the Universal policy on June 1, 2003.
20 Plaintiffs dispute this, arguing that the magnitude of the loss was not apparent to plaintiffs until
21 January 2004 when the city red-tagged the building.

22       The California Supreme Court has articulated a "manifestation of loss rule" to govern in the
23 insurance context. See especially Prudential-LMI Commercial Ins. v. Superior Court, 51 Cal.3d
24 674, 699 (1990). Under this "manifestation rule," liability in "first party progressive property loss
25 cases" falls completely on the insurer of the property at the time the loss "manifests"—that is, at
26 "that point in time when *appreciable damage* occurs and is or should be known to the insured, such
27 that a reasonable insured would be aware that his notification duty under the policy has been
28 triggered." Id. (emphasis added); see also Larkspur Isle Condominium Owners' Assn., Inc. v.

UNITED STATES DISTRICT COURT
For the Northern District of California

1  Farmers Ins. Group, 31 Cal. App. 4th 106, 109-10 (1994) ("[T]he insurer on the loss at the time of
2  appreciable damage is responsible for the entire loss, not only that portion discovered during the
3  policy period."). "Once a loss is manifested," the California Supreme Court has explained, "an
4  event has occurred that triggers indemnity unless such event is specifically excluded under the
5  policy terms." Prudential-LMI, 51 Cal.3d at 699. Thus, the insurer at the time this "event ...
6  occur[s]" is liable for any and all loss not otherwise excluded from coverage. Id.; see also Sapiro v.
7  Encompass Ins., 221 F.R.D. 513 (N.D. Cal. 2004) (Patel, J.) (where this court found that because
8  "appreciable damage" occurred after the expiration of an insurance policy, the ensuing loss was not
9  covered).

10  In the present action, unlike in Sapiro, defendant contends that "appreciable damage"
11  occurred *prior* to the inception of the insurance policy, barring coverage. In support of its
12  contention that the walls of the Ferry Building had been cracked prior to June 1, 2003, defendant
13  offers up numerous deposition statements, declarations, videotape testimony and even court filings.
14  See, e.g. Fitzhugh Dec. ¶ 4 (noting that there were cracks in the wall at the time of the 1998
15  purchase); Lopez Dep. at 26:14–27:1 (observing that the walls had large cracks approximately one-
16  inch wide); Lopez Dep., Exh. F (videotape showing one such large crack along the length of one of
17  the walls of the Ferry Building); Salts Dec. at 12:3–14 (observing that in late 2003 the cracks
18  appeared to have been repaired with mortar); and Eghtesad Dep. at 232:5–7 (noting that in their
19  court filings plaintiffs made reference to the existence in 1998 of numerous "hairline cracks" in the
20  wall of the Ferry Building).

21  Plaintiffs do not dispute that there were cracks, or that these cracks had themselves been
22  "patched," prior to June 1, 2003. See, e.g., Pl.'s Opp. at 10:24–26 (emphasis added) where
23  plaintiffs, in asserting that they did not notice any cracks existed when they purchased the property,
24  state that

25  > [p]resumably the crack existed, but was patched since Plaintiff Nader Eghtesad did not see any cracks at purchase, no repairs were made to the building, and the sellers said there were
26  > only hairline cracks, which *implies the mortar in the crack was stable and of no concern for 30 years*.

10

1   Further, although Eghtesad testified that he was not aware of any cracks in the building, plaintiffs in
2   their opposition brief implicitly concede that there were cracks in the walls. See Pl.'s Opp. at
3   10:3–4. 10, 15-16 (noting *inter alia* that the cracks were, as they had been in the past, "stable" in
4   mid- to late-2003 because of repair efforts that had been made previously).  Indeed, plaintiffs' own
5   engineering expert concedes that there was cracking in the walls "for many years prior" and that
6   these "cracks on the south and north walls are both seismic related." Rezezedah Dec. ¶ 14.

7   Rather than disputing the existence of cracks prior to the inception of the policy, plaintiffs
8   argue that although there were cracks in the walls of the Ferry Building prior to the policy period,
9   "the predominant cause of the cracks *opening up* and [the] creation of some of the new cracks [was]
10  due to causes covered by the Universal policy." Pl.'s Opp. at 1:8–10.[6]  In essence, plaintiffs assert
11  that the extent of the loss was only realized after "*something happened* [in the period] between
12  September 26, 2003 and December 17, 2003." Id. at 10:19 (emphasis added).  Consequently,
13  plaintiffs spill considerable ink detailing the fact that numerous individuals either did not notice the
14  cracks or did not take any actions after noticing the cracks.  For example, plaintiffs assert that
15  although officials from the City of Martinez visited the building several times, they only saw fit to
16  condemn the building after their December 2003 visit—suggesting that the cracks had worsened
17  considerably.   Similarly, plaintiffs assert, Lopez did not include "cracked walls" on the list of
18  complaints he gave to his attorney to aid in drafting a letter to Eghtesad—indicating that these
19  cracks were not a course of concern for the tenant.

20  Plaintiffs' assertions miss the point.  The exclusion under the Universal policy is for
21  "cracking" of the walls or foundations of the subject property, and the fact that there were "new
22  cracks" or "opening up" of old cracks during the policy period is irrelevant in determining the
23  inception of the loss for purposes of an insurance contract.  Plaintiffs concede that cracking of the
24  walls occurred prior to the inception of the policy period and that there was patching of at least one
25  of these cracks.  Whether or not such cracking was further exacerbated by the actions taken by
26  Lopez or by any other factor is immaterial since appreciable damage occurred prior to June 1, 2003.
27  As the Ninth Circuit has held "the inception of the loss occurs when the insured should have known
28  that appreciable damage had occurred, not when the homeowner learned the true extent of the

UNITED STATES DISTRICT COURT
For the Northern District of California

1  damage." Campanelli v. AllState Life Ins., 322 F.3d 1086, 1094 (9th Cir. 2003) (quoting Prudential-
2  LMI, 51 Cal. 3d at 674). Plaintiffs were aware, or should have been aware, that the walls of the
3  Ferry Building were cracked prior to this date and thus under the manifestation rule their loss is not
4  covered by the policy.

        B.        Policy Exclusions—Efficient Proximate Cause

Defendant contends that even if "appreciable damage" is found to have occurred within the policy period, plaintiffs' breach of contract claim must still fail as a matter of law because their loss is listed as an exclusion under the terms of the policy. All loss that is "caused directly or indirectly by . . . cracking" is expressly excluded under the policy. Redfern Dec., Exh. B at 24–25. The only exception to this exclusion, is cracking that is caused by certain "specified perils." See note 3 *supra*. These specified perils are inapplicable in the present action and plaintiffs do not contend that their loss falls within this exception. Rather, it is undisputed that the loss in the present case is the "cracking" of the walls of the Ferry Building (as detailed by the City of Martinez in its Vacate Notice). Thus, defendant asserts, plaintiffs' coverage claim was properly denied.

In response, plaintiffs assert that they are entitled to coverage because the "cause" of the "cracking" was the negligence of their former tenant Lopez who allegedly used car frames attached to the north and south walls of the Ferry Building while conducting his auto-body business. Defendant disputes this, contending that the cracking was due to seismic activity, which is among the listed exclusions in the policy. See Redfern Dec., Exh. B at 25 ("earth movements, including but not limited to earthquake. . ." are excluded).

It is settled that the "scope of coverage under an all-risk homeowner's policy includes all risks except those specifically excluded by the policy." Pieper v. Commercial Underwriters Insurance, 59 Cal. App. 4th 1008, 1018 (1997) (citing State Farm Fire & Cas. Co. v. Von Der Lieth, 54 Cal. 3d 1123, 1131 (1991)). However, California courts have found that "when a loss is caused by a combination of a covered and specifically excluded risk, the loss is covered if the covered risk was the *efficient proximate cause* of the loss." Chadwick v. Fire Ins. Exch., 17 Cal. App. 4th 1112, 1117 (1993) (citing Garvey v. State Farm Fire & Cas. Co., 48 Cal. 3d 393, 402–04 (1989))

12

(emphasis added). The California Supreme Court first discussed this concept in Sabella v. Wisler, 59 Cal. 2d 21 (1963), holding that:

> [i]n determining whether a loss is within an exception in a policy, where there is a concurrence of different causes, the efficient cause—the one that sets the others in motion—is the cause to which the loss is to be attributed, though the other causes may follow it, and operate more immediately in producing the disaster.

Id. at 31, 27 (alternations in original omitted). In Garvey v. State Farm Fire & Casualty Co., 48 Cal.3d 395 (1989), the court modified this formulation somewhat, holding that the efficient proximate cause is the "predominant" or the "most important" cause of the loss. Id. at 402, 406; see also Tento v. State Farm Fire & Cas. Co., 222 F.3d 660, 663 (9th Cir. 2000).

The California Supreme Court has emphasized the factual nature of this determination. For example, in Garvey, the court concluded that the trial court erred in directing a verdict on the question of efficient proximate cause, holding that "[c]overage should be determined by a jury under an efficient proximate cause analysis." Id. at 412; see also State Farm Fire & Cas. Co. v. Von Der Lieth, 54 Cal. 3d 1123, 1131 (1991) (observing that "the question of what caused the loss is generally a question of fact"); Pieper, 59 Cal. App. 4th at 1019 (citing Garvey, 48 Cal. 3d at 395) ("[c]overage should be determined by a jury under an efficient proximate cause analysis.").

Defendant argues that the cause of the cracking is irrelevant in the instant action since this case involves a single cause of loss which is expressly excluded from coverage. It is true that California courts have observed that if "the evidence shows the loss was in fact occasioned by only a single cause, albeit one susceptible to various characterizations, the efficient proximate cause analysis has no application." Chadwick, 17 Cal. App 4th at 1117. Further, California courts have observed that in such situations, the contracting parties do not have license to interpret an insurance policy in a manner "which flies in the face of common sense and the mutual intention of the parties" by allowing exclusions in the policy to be swallowed up by characterizations of the loss. Pieper, 59 Cal. App. 4th at 1020–21. "[I]f every possible characterization of an action or event were counted [as] an additional peril, the exclusions in all-risk insurance contracts would be largely meaningless. [For a]n earthquake [which was specifically excluded], it could be said . . . [that it] was merely the immediate cause of loss and was itself the result of "changing tectonic forces," a nonexcluded peril."

13

Chadwick, 17 Cal. App 4th at 1118. Defendant places particular emphasis on Pieper where, in rejecting insured's attempt to claim coverage for loss due to a brush fire (excluded), asserting that it was an "*arson*-fire," the court noted that "the crucial and undisputed fact is that the [l]oss was caused by a brush fire sweeping across seven miles of brush land and destroying everything contained thereon before causing the [l]oss. . . just as a leak cannot occur without a break in a pipes[sic], a brush fire cannot occur without a source of ignition." Pieper, 59 Cal. App. 4th at 1019. Similarly, defendant argues, the undisputed fact is that the loss in the present action was caused by cracking, and thus the cause of the cracking is irrelevant and plaintiffs may not attempt to characterize the cracking in such a manner as to overcome the clear exclusion.

It is true that in the present action, although plaintiffs in their expert report list the use of chains on the walls of the building as a cause, the undisputed "cause" of the cracking is seismic activity and the ground de-stabilization caused by the periodic overflow of the Alhambra Creek. These perils are specifically excluded under the policy. See Redfern Dec. ¶ 4, Exh. B at 24–26 (sections (l) and (o)). Moreover, plaintiffs' argument is not that Lopez caused the cracking but that rather he exacerbated a pre-existing condition—resulting in new cracks and opening up of old, repaired cracks. Under a single-causation analysis, such a contention is insufficient to overcome the clear exclusion for "cracking."

Notwithstanding, it is of note that even under a multi-causation analysis plaintiffs are still not entitled to coverage as a matter of law. For a multi-causation analysis to apply, there must be "two separate and distinct perils which could each have occurred independently of the other and caused damage." Pieper, 59 Cal. App. 4th at 1019. Here, the two perils which caused the cracking in the walls of the Ferry Building would presumably be the negligence of Lopez and the seismic activity—separate and independent perils which would make summary judgment inappropriate under an "efficient proximate cause" theory. However, third party actions are also specifically excluded under the terms of the current policy. Pursuant to section (k) of the policy, "*acts or decisions*, including the failure to act or decide, *of any person*, group, organization or governmental body" are not covered. Redfern Dec. at 25–26 (emphasis added). Thus, even if Lopez did in fact cause some of the damage by attaching chains to the walls, the resulting loss ("cracking") is still not

14

1 a covered peril. Thus, under an efficient proximate cause analysis, even though there are two
2 independent causes alleged, both are specifically excluded. See Sapiro v. Encompass Ins., No. 03-
3 4587, 2004 WL 2496090 (N.D. Cal. Nov. 2, 2004) (Patel, J.) (rejecting as "tortured" the implication
4 in plaintiffs' argument that "a property loss caused by a combination of two excluded perils falls
5 outside of both exclusions.")

6       Given the foregoing, the court finds that the claimed loss is not covered because (1) plaintiffs
7 were on notice that the walls of the Ferry Building were cracked prior to June 1, 2003 and (2) the
8 loss falls within the exclusions of the policy. Plaintiffs have not met their burden in demonstrating
9 that there are any genuine disputes over material facts which would defeat defendant's motion for
10 summary judgment. See Gasaway, 26 F.3d at 960. Although a district court is barred from
11 weighing evidence that is presented in a summary judgment motion, the court may determine, as the
12 court does here, that a reasonable jury could not find in plaintiffs favor. TSC Indus. v. Northway,
13 Inc., 426 U.S. 438 (1975); West v. State Farm Fire & Casualty Co., 868 F.2d 348, 350 (9th Cir.
14 1989). Defendant is entitled to summary judgment on plaintiffs' breach of contract claim as a matter
15 of law.

17 III.    Other Bases for Coverage
18     A.    Emergency Repairs & Lost Profits

19       Defendant contends that, although plaintiffs' complaint includes claims for emergency
20 repairs and lost profits, the policy provides no separate coverage for either. See Complaint ¶¶ 13,
21 14, 16. In their opposition to defendant's motion to strike this claim, plaintiffs do not address this
22 contention and point to no provision of the policy that entitles them to coverage absent an underlying
23 eligibility for loss coverage. Given the above determination that plaintiffs' claim is not covered
24 under the terms of the policy, their separate claim for emergency repairs and lost profits must fail.

26     B.    Umbrella Coverage
27       Defendant asserts that plaintiffs' claim that the policy's personal umbrella policy is
28 applicable to cover their loss is similarly unavailing. See Complaint at 4:-16-17. As correctly noted

15

by defendant, an umbrella or third-party liability policy is implicated when there is a legal obligation to pay damages to a third-party. See., e.g., Chu v. Canadian Indemnity Co., 224 Cal. App. 3d 86, 94 (1990); Certain Underwriters at Lloyg's of London v. Superior Court, 24 Cal. 4th 945, 960 (2001). Here, there is no assertion that any third-party is seeking damages from plaintiffs. Indeed, plaintiffs concede the argument, making no mention of this claim in their opposition to defendant's motion for summary judgment.

### C. Lopez's Floor Removal

Defendant's also contend that, in their interrogatory responses, plaintiffs seek coverage for Lopez's removal of the hardwood floor in Area A (the office space) of the Ferry Building. Plaintiffs assert that Lopez removed the flooring without their permission while Lopez insists that it was at the direction of Nader Eghtesad. However, "any . . . intentional act, committed by (1) any person or organization [to] whom [you] entrust the property" is excluded under the policy. Redfern Dec., Exh. B at 25. Thus, as defendant contends, whether or not Lopez was given permission to remove the floors is immaterial; as an individual entrusted with the property under a lease agreement, Lopez's intentional acts are not covered.

## IV. Declaratory Relief

In their second cause of action, plaintiffs seek declaratory relief that they are entitled to coverage under the emergency repair and lost profit provisions of the policy and that defendant wrongfully denied coverage as a result of plaintiffs' country of origin. See Complaint ¶ 16. Plaintiffs are not entitled to declaratory relief because, as discussed above, their loss was not covered under the terms of the policy. Moreover, as defendant asserts, declaratory relief is not an available remedy when a dispute has matured into a suit for damages. See Hood v. Superior Court, 33 Cal. App. 4th 319, 324 (1995).

Additionally, defendant correctly argues that plaintiffs' claim for declaratory relief for discrimination based on his national origin is improperly pled. Pursuant to California Code of Civil Procedure section 1060, a party may seek declaratory relief as a form of remedy to clarify rights

16

under a contract. There is no cause of action under section 1060 for alleged discrimination. Plaintiffs offer no argument in opposition to defendant's motion for summary judgment with respect to the claim for declaratory relief. Thus, the court finds that defendant is entitled to summary judgment on plaintiffs' second claim.

V.   Punitive Damages

Given the above discussion, the court need not reach defendant's arguments with respect to the availability of punitive damages for a breach of contract claim.

CONCLUSION

For the foregoing reasons, plaintiffs' motion for continuance is DENIED and defendant's motion for summary judgment is GRANTED.

IT IS SO ORDERED.

Date: July 27, 2006

_____
MARILYN HALL PATEL
District Judge
United States District Court
Northern District of California

### ENDNOTES

1. To the extent that the court has relied upon materials to which the parties have lodged objections, these objections are overruled. Notwithstanding, the court grants the following objections to evidence filed by defendant Universal:

    First, defendant asserts that portions of Rezazadeh's declaration should be stricken under the "sham declaration" rule. A deponent cannot create a dispute of fact by saying one thing in her deposition and then contradicting it in a declaration. See Scamihorn v. General Truck Drivers, 282 F.3d 1078, 1086 (9th Cir. 2002) (citing Kennedy v. Allied Mut. Ins. Co., 952 F.2d 262, 266 (9th Cir. 1991)). In his deposition, Rezazadeh states that he has no opinion on whether the cracks in the walls were enlarged between May and July of 2004. Rezezedah Dep. at 69:14–25. However, in his declaration, he contradicts his deposition testimony, asserting that [i]n December 2003 and January 2004, the cracks show significant amounts of light and increased widths." Additionally, he states that "it is my opinion that the manmade forces created and exerted on the brittle URM walls of the 908 Ferry Street building after June 1, 2003 did predominantly and proximately cause and contribute to the building's failure." Rezezedah Dec. at 5:10–11, 8:22–9:3. Thus, to the extent that Rezezedah's declaration contradicts his deposition testimony, it is stricken.

    Second, Rezezedah's factual observations about plaintiffs' conduct and motivations regarding the Ferry Building, are inadmissible for lack of personal knowledge.

    Third, Exhibits B through H to Rezezedah's declaration are inadmissible for lack of foundation. Rezezedah does not state that he is the photographer nor does he provide any dates for the photographs.

    Fourth, the deposition transcripts from other actions submitted by plaintiffs are inadmissible. Pursuant to Federal Rule of Evidence 804(b)(1), deposition testimony is only admissible if the party against whom the testimony will be used has had an opportunity to cross-examine and the witnesses are currently unavailable. Plaintiffs have demonstrated neither.

2. "LOSS" is defined as "direct physical loss or damage occurring during the Coverage Part period." Redfern Dec. ¶ 4, Exh. B at 24.

3. "SPECIFIED PERILS" are LOSS caused by:
(1)     fire; lightning; smoke; explosion; windstorm; hail; weight of snow; ice or sleet; vandalism; malicious mischief; riot; civil commotion;
(2)     leakage from fire extinguishing equipment; accidental discharge or leakage of water or steam

        as a direct result of the breaking or cracking of any part of a system of appliance containing water or steam;
(3)    aircraft or its falling parts; actual physical contact of an AUTO with the insured property;
(4)    removal of covered property from LOCATIONS endangered by an insured peril.

Redfern Dec. ¶ 4, Exh. B at 24.

4. "UNNAMED PERILS" are "all causes of LOSS *not* defined in SPECIFIED PERILS and BREAKDOWN, or excluded." Redfern Dec. ¶ 4, Exh. B at 24 (emphasis added).

5. "BREAKDOWN" is defined as "a sudden and accidental breakdown of mechanical or electrical equipment." Redfern Dec. ¶ 4, Exh. B at 22.

6. Plaintiffs reiterated these statements at oral argument, conceding that they were aware of cracks in the walls of the Ferry Building prior to the start of the policy period and asserting that they are nonetheless covered by the terms of the policy because these pre-existing cracks had been in stable condition for over thirty years. According to plaintiffs it is the "opening up" of these cracks that created the health hazard and led to the Vacate Notice.